Okay, our next case this morning is number 19-1692 Cooper Ports America, LLC v. Secretary of Defense, Mr. Grossman. Good morning, Andrew Grossman for Appellant Cooper Ports America or CPA. May it please the Court, when the government commits itself to provide preliminary notice before it exercises an option, the contractor has the right to rely upon that commitment. The contractor is entitled to a preliminary notice that is timely, that is unambiguous, that actually identifies the option at issue so that the contractor can act on that notice. As to identify the option at issue, you're reading the FAR provision dealing with options as applying to preliminary notices? I think that identifying the option really fits into two of our arguments. Yes, it does certainly apply to the FAR provision that applies to notices, but I think it also goes to the ambiguity point. I think the government doesn't dispute it. I mean, the FAR doesn't deal with preliminary notice at all, right? The FAR provision at issue speaks… No, no, answer the question. The FAR doesn't deal with preliminary notice. Your Honor, it does not use that language, but I think in this case it would apply to the preliminary notice because for the government to provide notice of the exercise of an option, the contractor breaks that into two steps. The government has to provide the preliminary notice and then the final notice. If it provides one or the other, then the government has not provided the notice of the exercise of the option. In other words, it's not effective. In terms of whether it's an obligation to refer to the option clause, you're relying on the FAR provision. I guess it's 17207G, right? Yes, for that particular argument. But on the face of it, that provision doesn't seem to apply to this preliminary notice issue, which isn't covered by the FAR at all. Well, Your Honor, as I said, I think that there are two ways of looking at it if you look at the text of it. The text says notice of the exercise of the option. This contract splits that required notice into two pieces, and the regulation doesn't provide any basis to distinguish between those two pieces. The regulation doesn't say, for example, final notice. It just says notice of the exercise, and here that's two pieces. They're both required. But if there are any doubt on that, I think you can look at the purpose of the regulation, which is to provide the contractor actual knowledge of what it is that the government is seeking to do so that the contractor can act appropriately on that. In other words, can rely on it and understand what it is the government is talking about. And so I don't see, with respect to the regulatory purpose, there's any reason either to distinguish between a final notice and a preliminary notice. Your ambiguity argument is separate and apart from the 17207g argument, right? That is correct, Your Honor. And I don't understand the government to dispute that if it is ambiguous as to which option a preliminary notice addresses, then that option is therefore ambiguous such that it is not legally effective as notice. What's ambiguous about it? Pardon? What's ambiguous? About the notice here? Yeah. I think there are two central ambiguities, and really they concern the two elements of what a preliminary notice has to do. The first is simply, was the government providing preliminary notice at all? Is that what it was doing? Is that how this communication should be understood? And then the second is, fine, let's say it was perhaps providing some kind of notice. Does it identify the option for which it is providing notice? And I think on both of those, you have really just a central ambiguity here. You have what was an informal communication. Why would you provide notice with respect to the other option when the contract didn't require notice, preliminary notice? Well, again, I think that that assumes in this instance that the email at issue was preliminary notice. The so-called six-month option here does actually require notice, requires notice for the government to exercise it. And the email here, if the email said, this is preliminary notice, then sure, I guess we would all know that it's not referring to the six-month option. But the email actually doesn't say that. It is a point of dispute between the parties as to whether the email can be understood as providing notice at all. And I would note that the contracting officers- I'm not understanding the argument. The notice on its face talks about preliminary notice, right? No, it does not, Your Honor. It does not use the word notice. It does not say preliminary notice. It does not say notify. It doesn't use any of the language that one might expect to see. The email at issue is available on page 117 of the appendix. And it certainly states that the government intends to exercise options. But it continues and says, at awarded rates on contracts. And what the dispute was- I think the context in which this email arose is very important. Can I just- I just want to, I guess, clarify things. Put aside your contention that this could not constitute a preliminary notice. There is the separate question, which is what I've been focusing on. It seems to me that on its face, this is an email that does not make clear whether it's paragraph 8 or paragraph 9 of the 36 contract that is being referred to. And as I take it, the government's maybe only, but anyway, principal response to that is, how could it possibly be the paragraph 8? You don't have to give preliminary notice. And it doesn't seem to me that that is a sufficient response in the context of a completely informal communication, which was not even intended to be a preliminary notice. Though, as the board said, it may in fact have been one. But if it's- if it was in fact a preliminary notice, even though it wasn't intended to be, that still leaves the question, what was the writer, Mr. Seaman, referring to when he said, we intend to follow the contract and to, I guess, exercise options without saying which ones. And the informal context does tell you something about, or doesn't tell you, this is, I thought, I want you to concentrate on this point. What does that tell you about the question? Could anybody really think it was referring to paragraph 8? So, Your Honor, I think, could anybody think that it was referring to- Do you know what I mean by paragraph 8? The six-month option, Your Honor. Yeah, there's 8 and 9, right? So, the answer is yes. Not only could someone think that, the two government employees who are responsible for administering this contract both testified that that was a reasonable interpretation of the email. Mr. Seaman, who wrote the email and was the contracting officer on the contract, testified that it could refer to some combination of the year-long options, or it could refer to the six-month option, or maybe it refers to all of them. He indicated- But that's not what we're dealing with here. We're trying to deal with the interpretation of the notice on its face without regard to what, you know, some testimony about the subjective interpretation might have been by the contracting officer. On its face, how could this refer to the six-month notice? Because the six-month notice doesn't seem to require a preliminary notice. Well, so, you know, I'll bookend the issue of extrinsic evidence, but I will note that, you know, we don't think that this- that an informal email sent by the government to a contractor is a contract in and of itself. It's not produced in the way that a contract is, and the government hasn't gone through the scrutiny of the government to be a contract. But putting that aside- I mean, you know, the contemplation of the contract, this is, as we discussed earlier, this is not something that the FAR deals with. This seems to be particular to this contract, and it says give preliminary notice, which, you know, it would seem on the face of it as though that could be informal. Isn't that correct? Your Honor, to be clear, we're not arguing the government has to use a particular form. We're not arguing it has to use a particular language. But it's common ground between the parties that what the government does have to do is it has to be unambiguous. And in this instance, there was at least two ambiguities on the face of this email if you're going to take it as potentially being some kind of notice by the government. But I think it's important to understand that when the government is providing notice, what it's providing is notice of its intent. In other words, it has to formalize an intent. The government has processes that it goes through to determine whether it's going to exercise options, whether it's going to reach out to the contractor. This isn't something that is just done in an informal fashion on the government's end. And so for the government to actually do that, for the government to proceed and to send the notice, the government has to have that intent and then to communicate that intent to the contractor. And I think there's an ambiguity on that. The intent? That is literally what – in other words, it has to have determined that it intends, not that it's committed, but that it intends to exercise the option at issue. But it doesn't have to have – the contractor obviously doesn't have to have the subjective intent to provide notice pursuant to the contractor as long as he does it, right? Correct, Your Honor. But you're saying he has to have the intent to exercise the option. The government – But then once the COO has that intent, then a completely accidental communication of that intent would – and I think this is what the board said – communicate it. Right. As long as it's unambiguous and those other five adjectives that the board – That is correct, Your Honor. And we, you know, if there was some confusion about the intent, we don't think that would make a difference. I bring up intent for a different reason, which is that the government actually has to arrive at a position itself, and then that's what causes it to send the notice. So you wouldn't expect to see this kind of thing in an informal email. You wouldn't expect to see it without some type of language that indicates that the government is actually intending to exercise a particular option. In other words, as opposed to just options in general in the future. And you certainly wouldn't expect to see it in an email that is part of a conversation on a different topic where that email is responsive to the email that preceded it and indeed quotes it in its entirety. This was months before the preliminary notice was due. Nobody was thinking about preliminary notice. And CPA had been for several weeks – But apparently they were thinking about exercising the option, right? They were not thinking, Your Honor, about providing preliminary notice. And indeed, Mr. Seaman, the contracting officer, testified that when he sent the late, the untimely formal notice letter, that his view was that he had not sent preliminary notice earlier. So, no, he was not thinking about sending any kind of notice to CPA with respect to the exercise of an option at that point. As crisply as you can, I'm really focused in on this paragraph 8, paragraph 9 potential ambiguity. I believe Judge Toronto raised it at the very beginning. Can I just hear your clearest explanation why it's at least somewhat reasonable that Mr. Seaman here could be invoking or referencing the paragraph 8 option and why it would be unreasonable to think that Mr. Seaman is referring only to the paragraph 9 option? All right, so the preceding email was requesting to renegotiate rates. Mr. Seaman responded, and he wrote, the government intends to exercise options at awarded rates on contracts. It didn't say what options. The focus of the sentence, the focus of what he was saying was the at awarded rates. He was not distinguishing one way or the other between either of the different types of options that were present in this contract. And I will note, as I said, that both Mr. Seaman as well as the contract specialist responsible for this contract. I'm focused just on the email itself. I mean, assuming that that's what we have to decide whether it's ambiguous, I don't know if looking back into the subjective intentions of different people or subjective views necessarily answers that question. Well, I mean, I think that – So just stick to the email. Yes, Your Honor. So are you done with your answer? Sticking to the email, the answer is the focus was on the rates. It spoke generally about options. It made no attempt to distinguish between the different types of options as everyone who saw this, I think, recognized and testified. So can I continue on this point a little bit? And this is what I've been focusing on. It does seem to me that the point Judge Dyke mentioned and I think is, to my mind, the only thing that the government says about it couldn't possibly have been paragraph 8 because no intent needed to be given as to paragraph 8. And what seems odd to me about that is that for that to have force, it seems to me one would have to assume that in a completely informal email communication, not intended to be a formal notice, that the subject matter of the assertion of intent would be limited to only that which is contractually required. And I don't see a basis for that in an informal communication. What I just said is an idea that, to my mind – I want to hear what the government has to say – would be quite helpful to your point of view. What do you think about it? Your Honor, we agree with that. We argued that as much in our reply brief in response to the government's argumentation on the distinction between these two different options. Basically, the government's argument on this point simply assumes the result. I mean it just assumes that you would have, as Your Honor put it, this level of particularity and formality that there's no reason to expect would have appeared in this type of informal communication on a different topic that was addressing options generally as opposed to any particular option at all. Well, what about the prior emails that preceded this January 31st email? I'm looking particularly at the January 24th email, which is from the contracting officers. It says the final schedule of rates did not contain such and such and such and such. It contained only – it contained the base option periods and summary tabs as required by the call. What option periods does that schedule refer to? Oh, I believe that refers to the four – I guess it would be at that point it would be the three because the first option had already been exercised. The three option periods, the year-long option periods. Well, doesn't that shed some light maybe on what's meant by the January 31st email? I think it does, Your Honor, but I think perhaps not in exactly the way that Your Honor may be anticipating, which is that CPA was going back and forth with the government. They had been, as they had been since before CPA purchased the predecessor business here, about renegotiating the rates. And CPA was trying to convey to the government here are the rates, here are the adjustments, here's what we're looking at for the life of – the potential life of this contract. Your client was concerned about having to perform in the future based on these rates in the contract, right? Your Honor, I mean, there is evidence on that specifically. Our client was concerned about having to perform at that moment because, as it told the government, it was losing a fair amount of money every single month and was contemplating defaulting on the contract in the short term. In other words, immediately before there were any other options that would potentially be exercised. I'm still not quite following this. If this January 24th email, one week before the critical email, refers to a schedule, which refers to the one-year option periods and not the six-month period, why isn't it reasonable to read the January 31st email as referring to those same option periods? Oh, that has to do with the difference between the options. The Paragraph 8 option, that is the six-month option, actually contains in the option itself a means of setting the rates, whereas the rates for the year-long options are provided for in the contract itself. I don't think you're answering my question. Maybe I'm not making myself clear. In this January 24th email, from the contracting officer to your client, it says a final schedule of rates, blah, blah, blah, and it says it only contained the base option periods. That reference to the option periods is to the one-year periods, right? Yes, Your Honor. And the reason is because those rates, which were among the rates that CPA wished to renegotiate, those rates were contained in the contract itself, whereas for the six-month option, there is no rate in the contract. It's set by a mathematical formula if the government exercises that option. Okay, so why would you read the January 31st email as referring to the six-month period when one week earlier the contracting officer sent an email referring to the one-year period? Because, Your Honor, if the parties had renegotiated the rates for the current option that was being exercised, the so-called year-one option, that would automatically then affect the rates of the six-month option. So the reason it wasn't included was because there was simply nothing to renegotiate with respect to that. I will note, CPA at that time was performing the year-one option, and so had it renegotiated the year-one rates, just by mathematics and operation of the contract, that would have affected the rates under the six-month option. Can I ask you one technical clarifying question? The email we've just been talking about, the January 24th, refers to the 36 Texas Gulf Beaumont-Port Arthur-Corpus Christi. I thought 36 was Charleston and 37 was Texas Gulf. That's correct, Your Honor. So this is talking about the same contract? I would have to look. I'd be happy to do that prior to rebuttal. Last question. This is more a legal question. Everybody agrees that the preliminary notice of intent to exercise an option has to be unambiguous, unqualified, yada, yada, yada. Do we only look at the January 31 email to decide unambiguity, or do we look at a lot of surrounding circumstances, emails leading up to the January 31 email, maybe emails after the January 31 email, and any other what I'll call extrinsic evidence? Or do you look at everything to figure out whether the contents of the January 31 email are unambiguous? Yes. So the legal standard here is that the email has to be capable of communicating, or I'm sorry, to be a notice, it has to be capable of communicating actual notice. That's a back question, and I think at the end of the day, it's totality of the circumstances, whatever might be relevant to that. Obviously, if you have a notice that is perfectly clear on its face, the other circumstances aren't really going to be all that relevant. But what about the opposite situation? Let's assume that there's some uncertainty in this email. Case over in your favor, or do we look at the additional material to figure out if in context it really was tolerably clear? I think there's a continuum. So there's a continuum of ambiguity. Certainly, if there's ambiguity, that increases the weight that one might place on extrinsic evidence to the email. But when you get to a certain point where you look at it and you say, on its face, this is just, it's hard to tell what it means, at that point, the ambiguity rule kicks in, and the parties agree that if it's ambiguous, it's not effective notice. And so at that point, I think you could just look at the face of it and say, this is simply ambiguous, and we think the court could go either way on that, because the email on its face is not clear as to what it was the government was actually providing notice of, if anything. Thank you, Your Honors. Okay. We'll give you two minutes for a moment. Thank you. Ms. Krasiniak, is that how you pronounce it? Yes. Very good, Your Honor. Could you start with my legal question that we just ended with your opposing counsel? Is it your view that the email on January 31 by itself has to be unambiguous and crystal clear? Or is it appropriate to determine whether that email communicates preliminary notice? You can look at other things, like, say, emails leading up to January 31, or perhaps emails after January 31 that perhaps suggests that everybody understood that the January 31 email was, in fact, preliminary notice. Right. The requirements of the FAR, of course, suggest that it's in writing and it's received more than 60 days before the actual option expires. And so the question of whether or not you need to look at the context of what the parties were talking about, I think we do agree that the email on its face, it has to be looked at within the context of the actual contract. As opposing counsel just indicated, the only— I'm sorry. I'm just looking for an answer here. Right. Are you saying the answer is yes, it's totally appropriate to look at a bunch of email exchanges leading up to January 31? With regard to whether or not a reasonable contractor would have expected the January 31 email to indicate notice of intent to exercise options, I do think it would be proper for the court to look at the full chain of what the parties were talking about. And also, of course, the contract terms themselves, which, as opposing counsel indicated, there are only awarded rates. So you can look at other things, perhaps other documents, to figure out whether document X is, in fact, unambiguously communicating preliminary notice. Is that the government's view? Whether or not—well, I mean, obviously we're here, we're under the Contract Disputes Act, not the Administrative Procedures Act here. And so there's not—to the extent we're getting into the intent of the contracting officer when he sent that email, you know, this court looks at the determinations of the contracting— I think the question related to these prior emails. And I had focused on the January 24 email, which has a reference to options. Right. And I think your opposing counsel agreed that that reference to options was to the one-year options. Can we look at that to interpret the January 31 email? I think that—yes, because the initial analysis for the court is whether the email meets the requirements of the FAR clause, which says intent to exercise options. Then to make sure to determine whether or not a reasonable contractor would have read that email. Just on the question of interpreting the reference to options to figure out, is that a univocal reference to the one-year option, or might it have been referring in the alternative to the six-month option? Put aside the multi-year. Just on that question, not 17207G, not whether it was intended to be a notice of intent, not anything else. Just interpreting the reference to the options, whether it is clearly referring only to the one-year option, or was ambiguous as to whether it was referring to either the one-year or the six-month. Do we get to look at the other emails? If so, what other evidence might we get to look at? Did the board look at other evidence? Did you and your brief rely on other evidence? Just on that question. Certainly, Your Honor. As I said, I think that it is proper for this court to look at the context of the email based on the communications between the parties. With regard to whether or not the court should delve into the extrinsic evidence as far as the depositions of the contracting officer and the contracting specialist, and getting into the subjective intent that was underlying that email before it was sent, that's where I think we're getting outside of the contract disputes act standard of review that this court is employing. So the testimony of at least Seaman and perhaps Elba also, that I guess I would like to hear you talk about, is not about their subjective intent, but rather both of them, and most clearly, well, one of them particularly clearly, recognized yes. Yes, this language was ambiguous. That's not subjective intent. We're contracting people. When I read this language, yes, it's ambiguous. Do we get to look at that? And why not? That's not subjective intent. Right. So the context of those questions, they were essentially being asked to read the email and say whether or not it could have been read a different way. The subjective intent of the contracting officer in sending that email is really what the analysis, what the opposing counsel is kind of trying to assert is the analysis. That's not what the Q&A at 221 and 220-221 of the appendix and 554 are about. They are about professional contracting officers reading the language and saying, is this clear to you or not? And they say no. Right. Understood. But that was within the context of the litigation there. And I think it's, I mean, I would refer the court to the testimony of the contracting officer at appendix page 258, where he indicates repeatedly that, yes, he did intend to send a more formal preliminary notice at a later point in time. I'm sorry. That's not the question at least I'm focusing on. I will give you for purposes of these questions that this was an intent to give notice of something or other. Right. And the only question is, is it ambiguous as to which of two options there was an expression of intent to give notice that the government intended to exercise? It's not ambiguous, Your Honor, because as the court noted, obviously, there's no necessary intent for the Dash 8 clause, but also only one of. Tell me that. I mean, as you know, I'm quite interested in that. Why does that matter? It seems to me in a completely informal communication, the communication would not, you would not expect it to be limited to that which the contract required somebody to give notice of. This is just the contracting officer in the middle of an exchange saying, you ask for more money, we intend to exercise options. It doesn't even say some options, it says options, but not, this is a document limited to the four corners of what we're required to say to you. So I think relevant there is that the full, the rest of the phrase after that was intend to exercise options at awarded rates. And again, the option years 1, 2, 3, and 4 have the previously awarded rates that are in the contract already. They appear at pages 59 to 61 of the appendix. Those rates have already been negotiated and awarded ahead of time. As opposed to, as appellant's counsel indicated, the Dash 8 options leave wiggle room within the clause to maybe negotiate different rates for that bridge contract or six month type of option. What does the six month option say in that respect? So on page 65 of the appendix is where the clauses as agreed to by the parties appear. And it says that the government, I'm reading the Dash 8 clause here, the government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revision to prevailing labor rates. But it does provide that if in the interim, perhaps the contract's been going on for five years, there have been adjustments to the prevailing labor rates. Those can be written in and changed within the context of that clause. Just as a matter of English, put aside the January 24th email. Why does it make perfect sense for Mr. Seaman to be saying, let's assume he was talking about a six month extension. We expect, we intend to exercise the option at that rate. No adjustment. As opposed to... No prevailing labor rate adjustment. Right, well obviously there's no requirement for the preliminary intent. But also, that could have been within, the clause provides for context to ask for an increase based on the additional labor rate. Now, I will note that they didn't follow up with emails asking that, saying, okay, well if you guys are exercising a six month contract, as we've indicated, we're losing money on this contract. That's because the prevailing labor rates are too high. Therefore, within the confines of that clause, we would like you to negotiate on the rates with us. The clear, the tone of the emails between the parties and sent internally after the fact, which are in the record, is that this was them shutting down negotiations on changing the contract rates. Which again... I'm sorry, this was... This was the contracting officer saying, we are not going to negotiate with you on contract rates. We are going to exercise options at negotiated rates. And I do think it's relevant to note that the negotiations on rates have been going on since, I think at least October 1st, it appears, for the first time in the record. Which is a full six months, or six weeks, excuse me, before the innovation agreement was ever signed and Cooper Ports actually assumed this contract. I think that timeline is relevant because here we have four to five, four months of negotiations by the time we get to this end of January email from the contracting officer. And as our brief indicated, the internal communications indicate that Cooper Ports was considering whether or not to default on the contract at that point in time. As this court is aware, defaulting on a contract is a very serious decision for a company to undertake, would impact their ability to be able to win more government contracts in the future. And so the context of the long scope of negotiations, and then the fact that the negotiations were essentially stopped after this email was sent, does indicate that the parties understood that he was talking about the four option year periods. Do we have this final schedule of rates, which is referred to in these two January 24th emails? Yes, Your Honor. So if you look at page 58, 59, and 60 of the appendix. 58. Okay. And so you see at the middle of the page there, it says on the left hand side, 01001 option, and then the unit price is 3.4 million or so dollars. And then the next page over you see the 2001 option and then below that the 3001 option, each with a different price. And so these are specific option year prices that were negotiated and agreed to by the party before this contract was signed. By the way, what should I make, if anything, to the reference to Texas Gulf and Beaumont? I believe that must have been a typo, Your Honor, because you're correct that the Dash 37 contract is the... What's the mistake? Is the mistake 36 instead of 37, or is it to the whole Texas Gulf? Were they trying to renegotiate both of the contracts? Yes, Your Honor. So maybe this email isn't even about the contract we're talking about. So they were trying to negotiate both options. And in fact, the second option year on the Beaumont contract was exercised just a few days after this email. And so that's not an issue at litigation, but there are similar contracts for... In which case it would not be even about the one we're talking about. Yes, Your Honor. It's talking about the Beaumont contract, and so that's R37 was the Beaumont contract. But that's in the context of the rates on both of these contracts. And then the contracting officer's email later does refer to both contract numbers saying, we intend to exercise the options at the awarded rates on these two contract numbers. And as I noted, I believe it is in the record, the Beaumont contract option was exercised actually just a few days later by the more formal preliminary notice that it is the practice of the government to issue. And on the previous page, there's a next day email referred to. I have the Gulf, Texas Gulf R37 attached. That's what led then to the settling of the Texas Gulf contract? Well, no, Your Honor. Because again, the January 31st email refers to both, by contract number, both the Charleston contract, which is the one that's issued before this court, and the Texas contract, the 30-37 and 36. Can you remind me what, if anything, in either the board opinion or your brief, makes something of, in particular, this January 24th email? I believe we did not specifically address it in our brief, nor did the board decision, Your Honor. Where does the record include the full email exchange leading up to this January 31st email? I believe it is not, the full chain is not in there, Your Honor. I did refer earlier to the October 1st. Is it in the record? In the record that was before the board? I believe it was. The full email was in the record before the board, Your Honor. The full email chain? I believe it is, although I obviously do not make it into the record before this court. But as I noted earlier, the discussion about the, talking about the rates on October 1st, that email appears in appendix page 113. Okay. It would be helpful to me, I don't know how my colleagues feel about this, to have the full email chain. Certainly. So, you know, could the parties get together and supply us with a supplemental appendix which has chronologically the full email chain? Was this negotiation or attempt at negotiation all in emails, or were there meetings also? There is reference in the emails to phone calls, so I do believe it took place over a phone as well. But obviously the emails were before the board. I would not expect that there would be. Recordings maybe? Not my understanding, Your Honor. Okay. So if you could do that, give us a supplemental appendix with the chronological email chain. Certainly. Both before and after the January 31st email, that would be helpful. Certainly, Your Honor. And as I mentioned, the chain, the internal emails among Cooper Ports reacting to these emails from the contracting officer implying that they maybe would have to consider defaulting on the contract, which again is a very serious choice for a contractor to make. That is in the record at page 118. But I think they are somewhat disjointed the way the parties put them in, so perhaps we could just get the full uninterrupted chain for the review. So we have at 8257 the contracting officer's deposition testimony saying that, yes, this reference to options in the email, quote, could be interpreted as either dash 9 or dash 8. And then the question is, and so two different reasonable minds could come to two different reasonable conclusions as to whether it's dash 8 or dash 9 that's being implemented. Is that fair? And then the contracting officer responds, that is fair. Right. So what's your clearest, cleanest, I don't know, two-sentence explanation why, when there are two different options provisions in this contract, why when the email just says options, he's necessarily referring to dash 9 and necessarily could not have been referring to dash 8? Right. All we have to go on is the word options. Understood, Your Honor. Just as an initial matter, of course, because we're under the CDA, the subjective intent of the contracting officer is not relevant to this court's analysis. However, He's just testifying what a reasonable mind would think. Certainly, Your Honor. But, I mean, again, because there's no deference given to the decisions of the contracting officer under the CDA, the necessary flip side of that is that we can't take into consideration what the contracting officer was thinking when they sent a particular email. But I think... Just answer my question.  Yes, of course, Your Honor. So the... Necessarily dash 9 and necessarily not dash 8. Necessarily dash 9 because the parties were talking about exercising options at awarded rates. There are no awarded rates for the dash 8 contract. In addition, because there's no requirement for a preliminary notice under the dash 8 contract, the clear context of this email is that they're talking about the four option year. Why couldn't the contracting officer be referring to dash 8 and saying, and by the way, my position is I want it to be the services option to be at awarded rates? Why couldn't it mean that? Again, because considering the context of this email chain, the fact that the parties are asking the government to increase its rates, had they understood... Do a price modification. Not necessarily a price modification to the immediate contractor, Your Honor. I don't think that's clear on the face of the email chain. Again, considering this contractor's position that they thought they were losing so much money under this contract that they purchased from another party, if they had understood the government to be exercising the dash 8 clause, it makes sense that they would try to say, okay, well, then we're within the clause that has the wiggle room for the prevailing labor rate adjustment. Okay, at the very least, can we up the rates given the prevailing labor rate adjustment? That seems to be relying on how you would think they would subjectively react to this email as opposed to what is the actual content of this email and why does it necessarily drive to one conclusion over another? I think the court needs to look at what a reasonable contractor would have done or thought in that circumstance when we're looking at whether or not the email meets the requirements of the FAR clause. Why don't we have testimony about exactly that on 220, 221, 257, and then Ms. Elb later? Why don't we have testimony on which point, Your Honor? What a reasonable contract or, I would think, contracting officer would understand from this language. And we have two professional federal contracting officers saying what they think this could mean. Right. Well, obviously, these are depositions taken by Cooper Ports Council, so the content of the depositions, it is what it is. Obviously, we're before this court on a summary judgment determination from the board, and so it was a legal conclusion only. There were no finding of facts at the board, so obviously there was no trial or any kind of more factual finding that we might expect coming off of a hearing here. So, again, I think that the confusion in the testimony between Ms. Elb, who's a contract specialist, and Mr. Seaman, who's a contracting officer, gets exactly to our point as to why this court cannot get into the subjective intent and impressions of a contracting officer when they're sending an email. I mean, the natural conclusion of that would be, say, a contracting officer believes that an exercise of an option has to go out on letterhead and it has to be sent by a first-class mail, so that contracting officer types everything up in an email, sends it to the party, but in his mind does not believe that he has actually exercised the option until he puts something on letterhead. Are we going to then say, well, the subjective intent of the contracting officer was not to actually exercise that option, therefore the option was not exercised? So the reasonable construction of the January 31st email is a question of law based on the documentary record rather than an inquiry into what a particular contracting officer or even the run of contracting officers might interpret. Absolutely, absolutely, Your Honor. The requirements of the FAR clause are not onerous. They are that it's in writing and that it's more than 60 days ahead of time. Is whether a party accepts a contract offer a question of fact or a question of law? Whether or not a party accepts a contract offer? Yeah. I guess acceptance within the construct of restatement of contracts, that's a legal determination. I would imagine as a matter of practice, parties probably would stipulate to when a contract was signed or when a contract was accepted as a fact. I'm not quite sure I understand the inquiry perhaps. Well, we seem to be extending the law here on acceptance of contracts, exercises of options to the world we're in right now, which is a preliminary notice of an intent to exercise an option. Right. And so exercising an option is very much, to me, basically saying acceptance of an offer. And so now we're trying to figure out whether the government issued a preliminary notice of an intent to exercise an option, accept an offer. And so the law on exercising an option by the government, it has to be clear. It has to be unambiguous. It has to be unqualified. And so I'm trying to understand unambiguity. Is that a question of fact or a question of law? Understood, Your Honor. So this court has not specifically extended that to notices of preliminary intent. I believe this court has not actually addressed a case. The government seems to be in agreement that the standard is it has to be unambiguous. It has to be unqualified. So the board has extended it to preliminary notices, and, yes, we have not taken issue with the board's approach with regard to that. But I mean, I will note that in the appellant's opening brief, they state that the intent of the government has to be unambiguous. And that is not the standard. The standard is whether the notice is unambiguous. We're not talking about the intent of the government to do something, which is maybe just semantics. But when we're looking here at just a written email from a contracting officer with the text that we have before the court here, it's not about what the government intended to do, but rather what the reasonable contractor reading the face of the notice would understand it to say. Okay. Thank you. If there are no further questions, thank you, Your Honor. Mr. Grossman, you have two minutes. Thank you, Your Honor. With respect to all this testimony that's been discussed, I mean, the particular testimony regarding which of these various options this email was referring to, that doesn't go to the government's intent. That's not our argument. We argued in our opening brief, being at page 20, that the email was ambiguous in what it meant in that respect, not what the government intended. That was a different argument that was presented earlier in our brief. With respect to that testimony, you know, look, you've got two government contracting officers with lots of experience. One of them testified that it could refer to any of these various options. One of them said, this is Ms. Elbey, that was the proper understanding of the email, is that it referred to all of the different options. Mr. Lewis, the Vice President for Operations at CPA, he testified that he has decades of experience in government contracting. He knows what this kind of stuff looks like. It didn't even occur to him that this was any kind of preliminary notice at all. With respect to the email that we talked about earlier, the January 24th email, I can confirm that that did in fact address the GULTS contract rather than the Atlantic Ports contract that's at issue here. But why doesn't the point stand that if that was referring to full year option rates and then the January 31st email refers to both contracts, that a reference in the January 31st email to options should share the meaning that apparently the January 24th email about only one of them had? A couple points. I mean, one, that was about an exchange of information regarding the renegotiation of rates. That's what that was about. It wasn't talking about that the government was going to be providing notice or anything like that. It was sort of a separate thing. I mean, really none of this was concerning notice, at least at the time. But what about – I mean, we'll get from counsel here in a few weeks to do this, the email chain. But is there anything in the email chain that indicates concern that the government would exercise these additional one-year options and therefore, in the contractor's view, inflict on the contractor an unreasonable obligation? Your Honor, I don't recall that there's anything one way or the other on the point. You know, what CPA was concerned about, and this is reflected in the email from Mr. Lewis that I referenced earlier, that they were losing money right then on a month-by-month basis and large amounts of money with respect to the contract. Four months to go on the original period, right? I believe it was – no, I believe it was actually more like six months, Your Honor, at that point. And not only six months. January 31st, it was six months? Right, because the contract – five months. My apologies. That's why I'm an attorney rather than a mathematician. But there was potentially that, and if you look at the six-month contract, I mean, that could bring it out another year that would be by default at the then-prevailing rates. So, I mean, if that's the option that we're thinking about, then that could be another year of performance, losing substantial amounts of money each month. Finally, I would like to address my friend's representation that Mr. Seaman sent the late, untimely notice with the intention of following up on the earlier email that he sent. He actually testified to the contrary. That's at page 245 of the appendix. The government keeps saying this, and I don't really understand why they say that when he actually testified that he did not send it, intending to follow up, because he believed at the time that he had not sent any type of notice whatsoever. Okay, thank you. Thank you, Your Honor. All rise.